## Case No. 16,337.

### UNITED STATES v. SMITH et al.

[1 Mason, 147.][1]

Circuit Court, D. Massachusetts.　Oct. Term, 1816.

REVOLT OF SEAMEN—"HIGH SEAS"—VOYAGE WHERE ENDED.

1. An endeavour to make a revolt within the act of 30th of April, 1790, c. 9, § 12 [1 Stat. 115], is an endeavour to excite the crew to overthrow the lawful authority and command of the master and officers of the ship. It is in effect an endeavour to make a mutiny among the crew of the ship.

[Cited in U. S. v. Smith, Case No. 16,345; U. S. v. Hemmer, Id. 15,345; U. S. v. Haines, Id. 15,275; U. S. v. Seagrist, Id. 16,245.]

2. A vessel lying on the sea, outside of the bar of a harbour of the United States, within three miles of the shore, is on the high seas.

[Cited in U. S. v. New Bedford Bridge, Case No. 15,867; U. S. v. Plumer, Id. 16,056.]

3. A voyage in shipping articles from A to B, or some other port, for a cargo of salt, and return to the United States, is not ended on arrival at the first port of the United States, unless it be the port of discharge.

Indictment against the defendants [James Smith and others] for an endeavour to make a revolt in a ship on the high seas, contrary to the 12th section of the statute of 30th of April, 1790 (chapter 9).

---

[1] [Reported by William P. Mason, Esq.]

George Blake, for the United States.
S. L. Knapp, for defendants.

STORY, Circuit Justice, after summing up the facts, delivered the opinion of the court as follows:—

The language of the statute is not of very easy interpretation; and the word "revolt" has not acquired so definite a meaning, as to be free from all doubt. After the best consideration, which we can give the subject, we are of opinion, that an endeavour to make a revolt in a ship is an endeavour to excite the crew to overthrow the lawful authority and command of the master and officers of the ship. It is in effect an endeavour to make a mutiny among the crew of the ship, or to stir up a general disobedience or resistance to the authority of the officers of the ship. A mere act of disobedience to a lawful command of the officers, is not, of itself, an endeavour to make a revolt. But to amount to the offence, it must be combined with an attempt to excite others of the crew to a general resistance or disobedience of orders, or a general neglect and refusal of duty. So if there be an endeavour to usurp the command and government of the ship, by combining the crew in hostility against the master and officers, this is properly an endeavour to make a revolt. We do not mean to assert, that the offence cannot be committed, unless by an attempt to stir up a general resistance or usurpation of the authority of the officers in all cases. If the crew were to combine together to resist a single lawful order of the master, or to compel him by force to yield up his authority in a single case, and were to proceed in the execution of their purpose, all their acts, done towards its accomplishment, might perhaps be properly deemed endeavours to make a revolt. What we mean to assert is, that the endeavour to make a revolt necessarily implies an attempt to stir up others of the crew to a resistance or rebellion against the lawful authority of the master and officers; and that the offence is not committed, if the party does not attempt or endeavour to combine, or excite others of the crew, to aid in his unlawful purposes.

Another question has arisen, whether the offence if committed at all, was in this case committed on the high seas. It appears, that the vessel at the time of the supposed offence was lying outside the bar of Newburyport harbour, but within three miles of the shore. Under these circumstances we are clearly of opinion that the place, where she then lay, was on the high seas; for it never has been doubted that the waters of the ocean, on the sea-coast, without low-water mark, are the high seas.[2]

Another question is, whether the voyage

was ended at the time of the supposed offence, so as to discharge the mariners from their service. The voyage by the shipping articles is, "from Newburyport to the Cape de Verd Islands, or some other port, for a cargo of salt, and return to the United States." The vessel on her return voyage anchored in the outward harbour of Boston, and was immediately ordered round to Newburyport, (the port to which she belonged,) to discharge her cargo. Upon the construction of the shipping articles we are of opinion, that the voyage did not end at the arrival at the first port in the United States, nor until an arrival at the port of discharge in the United States.

Verdict against the defendants.

---

[2] Quaere if it be necessary to allege this offence to be committed on the high seas, as the statute does not seem to make it local? Vide the 12th section of the act of 1790, c. 9.

